**HI LIMITED PARTNERSHIP**
**and Hooters of America,**
**Inc., Plaintiffs,**

v.

**WINGHOUSE OF FLORIDA, INC.; Winghouse of Kissimmee, L.L.C.; Ker, Inc.; Winghouse of Orlando, Inc.; Winghouse IX, L.L.C.; Winghouse XI, L.L.C.; and Winghouse XII, L.L.C., Defendants.**

**Ker, Inc., Counterclaimant,**

v.

**HI Limited Partnership, and Hooters of America, Inc., Counterclaim Defendants**

**No. 6:03–CV–116–ORL22JGG.**

United States District Court, M.D. Florida. Orlando Division.

Dec. 13, 2004.

Eric G. Maurer, Peter F. Schoenthaler, Steven G. Hill, Hill, Kertscher & Wharton, LLP, Atlanta, GA, Robin Uricchio Byrd, Thomas M. Burke, Holland & Knight, LLP, Orlando, FL, for Plaintiffs.

Gayle Wrede Kirkpatrick, George Donovan Conwell, Jr., Richard George Salazar, Suzanne R. Eschrich, Fowler White Boggs Banker, P.A., Tampa, FL, for Defendants.

## MEMORANDUM DECISION

CONWAY, District Judge.

On December 2, 2004, during the trial of this action, the Court granted the Defendants' motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50. This memorandum decision explains the Court's rationale for reaching that decision.

Plaintiffs HI Limited Partnership and Hooters of America, Inc. (collectively, "Plaintiffs") sued Defendants Winghouse of Florida, Inc.; Winghouse of Kissimmee, LLC; Ker, Inc.; Winghouse of Orlando, Inc.; Winghouse IX, LLC; Winghouse XI, LLC; and Winghouse XII, LLC (collectively, "Defendants") for alleged trade dress infringement and dilution in contravention of the Lanham Act, 15 U.S.C. § 1125(a); common-law unfair competition; and violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.204.[1] The essential gravamen of these claims is that the Defendants have used trade dress in the operation of their sports bars and grills that is confusingly similar to Plaintiffs' trade dress, particularly Plaintiffs' iconic Hooters Girl.

The Court begins by noting that Plaintiffs have experienced considerable difficulty in articulating the specific components of their trade dress. In the words of defense counsel, Hooters' trade dress has been a veritable "moving target" throughout this litigation. In fact, the Court found it impossible to resolve the

---

1. Defendant Ker, Inc. counterclaimed against Plaintiffs for breach of an oral agreement resolving the parties' differences concerning their trade dress. Following the Court's entry of a directed verdict against Plaintiffs, Ker, Inc.'s counterclaim was submitted to the jury, which returned a verdict in Ker, Inc.'s favor and awarded damages in the amount of $1.2 million. Of course, this result is inconsistent with any notion that the Defendants violated Plaintiffs' trade dress rights.

trade dress issues at the summary judgment stage because it could not ascertain Plaintiffs' trade dress. In its summary judgment order, the Court discussed the different and even conflicting versions of Plaintiffs' trade dress offered by Hooters' survey expert, its restaurant industry expert, its Fed.R.Civ.P. 30(b)(6) witness, Hooters of America, Inc.'s current and former corporate officers, and one of Hooters' original founders. *See* Doc. 183 at 14–17. Then, the Court stated: "Presented with these differing interpretations of Hooters' trade dress, the Court is unable to meaningfully assess questions of distinctiveness, secondary meaning and functionality. On the other hand, there obviously *is* a trade dress associated with Hooters, a prominent component of which is the Hooters Girl." *Id.* at 17 (emphasis in original).

During the Rule 50 arguments at trial, the Court was able to "pin down" Plaintiffs' counsel concerning the specific items of Hooters' trade dress. In response to questioning by the Court, counsel stated that Hooters' trade dress consisted of the following: the Hooters Girl uniform; rough-hewn rustic interior woodwork, including light colored wooden walls and floors; dining tables consisting of red wood of varying hues, surrounded by lighter pine wood, and covered with a shiny epoxy; a table-top setup consisting of a wooden vertical paper towel spool, wood-weave plateware, and table tents; a parchment paper menu bearing the story of the restaurant on its reverse side; surfboards; wall-mounted photographs of celebrities taken with servers; pictures of girls in attractive swimwear; road signs displaying clever sayings; hula hoops; large-bulb Christmas lights; wall-mounted sports memorabilia; bumper stickers; and "beachy" music from the '50s through the '80s.

To prevail on a claim of trade dress infringement, a plaintiff must prove: "1) its trade dress is inherently distinctive or has acquired secondary meaning, 2) its trade dress is primarily non-functional, and 3) the defendant's trade dress is confusingly similar." *AmBrit, Inc. v. Kraft, Inc.,* 812 F.2d 1531, 1535 (11th Cir.1986), *cert. denied,* 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987).

The Court must begin its discussion with the Hooters Girl. Although the parties and this Court recognize that elements of trade dress must be considered *in toto,* the overwhelmingly predominant feature of Hooters' trade dress is the Hooters Girl. As the Plaintiffs themselves have said, "The Hooters Girls are Hooters. They are not simply a marketing tool; they are the essence of the business." Doc. 183 at 5. In other words, without the Hooters Girl, there would be no Hooters. And what distinguishes the Hooters Girl from other sports bar and grill servers is her distinctive uniform, consisting of a white tank top shirt prominently featuring the Hooters name and "owl" logo across her chest, and orange nylon running shorts. Although Hooters Girls occasionally wear black uniforms, as a matter of law, those uniforms are not distinctive, nor have they acquired secondary meaning associated with Hooters restaurants.

█ The Hooters Girl is not entitled to trade dress protection because the evidence establishes to a legal certainty that the Hooters Girl is primarily functional. As Hooters has represented to state and federal regulatory agencies investigating complaints of discrimination, the Hooters Girl is not a marketing tool. Rather, Hooters has admitted that the Hooters Girl's predominant function is to provide vicarious sexual recreation, to titillate, entice, and arouse male customers' fantasies. She is the very essence of Hooters' busi-

ness. This essential functionality disqualifies the Hooters Girl from trade dress protection.

Even if the Hooters Girl were not primarily functional, her status as trade dress derives from her distinctive orange and white uniform. Hooters simply cannot prevent a competitor from using a server outfit as different as a black tank top and black running shorts. If Hooters could stop Winghouse from using that particular color and combination, then it could prevent any other competitor from using *any* color combination of tank top and running shorts. This would be an impermissible burden on competition. Moreover, a server uniform consisting of a tank top t-shirt and nylon running shorts is fairly common to sports bar and grills. Hooters cannot monopolize this generic theme any more than an upscale steak restaurant featuring tuxedo-clad servers could preclude competitors from using the same or similar uniform. The Court thus concludes, as a matter of law, that the Winghouse Girl, with her black tank top and black running shorts, is not a "knockoff" of the Hooters Girl.

■ The only component of Plaintiffs' trade dress that is either distinctive or has achieved secondary meaning is the Hooters Girl. The remaining elements of Hooters' trade dress consist of fairly generic items commonly found in sports bar and grills, beach-themed restaurants, and raw bars. The proper focus is on the overall appearance of the restaurants, rather than just the similarities. The differences between the two restaurants overwhelmingly predominate over their similarities; the differences are simply too significant to present a jury question of infringement. Beyond what has already been discussed

about the servers' uniforms, other significant Winghouse differences include the restaurant name, the restaurant exterior, the absence of orange, the full bar, the gaming area, the absence of a "beachy" theme, and the focus on former professional football player Crawford Ker himself. Similarities such as wood weave plates, vertical paper towel spools, wooden tables, table tents, wood interior, sports memorabilia and pictures affixed to walls, a menu that describes the restaurant on its reverse side, and even artifacts displayed in the Winghouses (e.g., surfboards[2]), are far too typical of other restaurants, particularly the sports bar and grill genre, to provide any basis for a finding of infringement. In other words, the differences between the restaurants' trade dress are so marked that no reasonable jury could find that there exists a likelihood of confusion.

■ These differences are also fatal to Plaintiffs' dilution claim. A claimant suing for dilution must prove that the trade dress used by the adverse party is "identical, or nearly identical," to the claimant's trade dress. *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1011 (9th Cir.2004) (trademark case); *see also AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 806 (6th Cir.2004) ("[E]very federal court to decide the issue has ruled that a high degree of similarity, ranging from 'nearly identical' to 'very similar,' is required for a dilution claim to succeed"). The materially significant differences outlined above preclude any reasonable jury from finding that Winghouse's trade dress is identical or nearly identical to Hooters'. Additionally, a dilution claimant must prove that its trade dress is famous. *See Kellogg Co. v.*

2. It cannot seriously be disputed that surfboards are commonly used as decor in many

Florida restaurants.

*Toucan Golf, Inc.,* 337 F.3d 616, 628 (6th Cir.2003) (listing fame as a necessary element). The only aspect of Hooters' trade dress that has achieved fame is the Hooters Girl. However, there is nothing about Winghouse's trade dress that diminishes the capacity of the Hooters Girl to identify and distinguish Hooters restaurants.

Finally, Plaintiffs' state law claims fail because they are founded on the proposition that Defendants' infringed and diluted Plaintiffs' trade dress, and the foregoing discussion conclusively demonstrates that Defendants did no such thing. The state claims require proof of unfairness, and no such proof has been presented.